UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MICHELE VIGIL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:14-cv-2166 |
| | ) | Judge Aleta A. Trauger |
| | ) | |
| SERVICESOURCE DELAWARE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

The defendant, ServiceSource Delaware, Inc. ("ServiceSource"), has filed a Motion for Summary Judgment (Docket No. 28), to which the plaintiff has filed a Response (Docket No. 34), and ServiceSource has filed a Reply (Docket No. 37). For the following reasons, the motion will be granted.

## BACKGROUND[1]

This case arises from the plaintiff's employment with ServiceSource in the company's Nashville, Tennessee office. The plaintiff, Ms. Vigil, began working with ServiceSource in April of 2012 and, within a couple of months, had been promoted to Team Lead for ServiceSource's account with a company named Arriba. As Team Lead, Ms. Vigil was the "front-line manager[]" for all day-to-day activity on the Arriba account, with her "main

---

[1] Unless otherwise noted, the facts recounted in this section are drawn primarily from ServiceSource's Statement of Undisputed Material Facts (Docket No. 30) and the plaintiff's response thereto (Docket No. 36). This section also contains facts from ServiceSource's Memorandum of Law in support of the pending motion (Docket No. 29), the plaintiff's Response Memorandum (Docket No. 35), and ServiceSource's Reply (Docket No. 37), that are not refuted or contradicted by the opposing party or the record. Where there is a genuine dispute of fact, the court will construe the fact in the light most favorable to the plaintiff as the non-moving party.

1

responsibilities" including (1) the coaching and management of the account's sales representatives, and (2) responsibility for ensuring that client goals were accomplished. (Docket No. 36 ¶¶ 8–9, 17.) In June of 2012, ServiceSource made the decision to expand its account with SAP, which was originally staffed with only one Team Lead. Ms. Vigil was transferred to the SAP account with the understanding that she would work as its second Team Lead and that she and the original Team Lead on the Account – a man named Alastair Miller – would share the same duties and responsibilities, with the sales representatives on the SAP account divided between the two of them. As Team Leader for the SAP account, Ms. Vigil was supervised by, and reported directly to, Account Manager Cody Green, who, in turn, reported to Client Delivery Director Brian Butler.

I.  **Ms. Vigil's Performance as Team Lead of the SAP Account**

During Ms. Vigil's tenure as Team Lead, the SAP account performed well enough to meet all of its revenue goals, and Ms. Vigil received every performance salary bonus that was available to her. (Docket No. 35, pp. 2, 9–12.)[2] Based on these "quantitative metric[s]" (Docket No. 36 ¶¶ 17), Ms. Vigil asserts that her performance as Team Lead was successful when "judged by the bottom line" (Docket No. 35, p. 2). The undisputed facts, however, demonstrate that Ms. Vigil's performance as Team Lead did not meet ServiceSource's expectations with regard to her management and development of the sales representatives under her supervision and her understanding of SAP and its business. The undisputed facts further demonstrate that these issues with Ms. Vigil's performance required consistent and repeated coaching not only

---

[2] As support for this assertion of fact (and for others in her Response), Ms. Vigil cites to pages of deposition testimony that are not contained in the record, because she has failed to introduce any evidence of her own, and ServiceSource has submitted only heavily excerpted transcripts of relevant deposition testimony. ServiceSource has not, however, disputed Ms. Vigil's citations to these depositions or her characterizations of the testimony found therein, and the court will, therefore, accept these facts as true for the purposes of summary judgment.

2

from Ms. Vigil's immediate supervisor, Mr. Green, but also from a director, Mr. Butler.

In Ms. Vigil's first months as Team Lead of the SAP account, at least five sales representatives expressed concerns to Mr. Green regarding her performance as Team Lead, including criticism that she lacked a working understanding of SAP's business and was ineffective in managing and developing sales representatives. (Docket No. 36 ¶¶ 23, 26–29 (citing Docket No. 30-4 (Depo. C. Green), 23:24–24:5, 26:16–27:6, 42:25–43:10).)[3] The concerned sales representatives included not only employees under Ms. Vigil's direct supervision, but also employees who worked on the SAP account under her counterpart, Mr. Miller, over whom Ms. Vigil had no authority. One sales representative on Mr. Miller's team, Lucy Buttitta, complained to Mr. Green on more than four occasions that the tone and style by which Ms. Vigil spoke to her and attempted to manage her was unprofessional and unwarranted. Ms. Buttita eventually resigned from her employment at ServiceSource and told Mr. Green that the sole reason for her departure was the way that she had been treated by Ms. Vigil. (*Id.* ¶ 23 (citing Docket No. 30-4, 23:4–8).)

Mr. Green conducted multiple one-on-one sessions with Ms. Vigil to discuss these employee grievances and provide her with guidance on the proper way to manage the sales representatives on the SAP account. Mr. Green further met with Ms. Vigil weekly to review her management of the team, areas of concern, and needs for improvement and development.

---

[3] Ms. Vigil argues that all statements made about her performance by sales representatives and clients are inadmissible hearsay because they are contained in Mr. Green's deposition testimony, and no independent evidence of the grievances are contained in the record. (Docket No. 36 ¶¶ 23, 26–29.) The court does not, however, find that the complaints made by the sales representatives are offered for the truth of the matter asserted – *i.e.*, that Ms. Vigil actually lacked understanding of SAP's business – but, rather, for their effect on Mr. Green and, ultimately, his supervisor, Mr. Butler, to whom Mr. Green related these complaints. These statements are not, therefore, hearsay, and the court will consider them in its ruling on the pending motion.

Finally, to assist her in developing the business intelligence necessary to be effective on the SAP account, Ms. Vigil was required to participate in biweekly shadow sessions. Despite this additional coaching, however, Mr. Green found that Ms. Vigil's management of the sales representatives improved only intermittently, and her understanding of SAP's business did not improve at all.[4] (Docket No. 30-4, 23:5–23:23 ("Q: So she would improve for a short period of time and then new issues would arise? A: Correct."); *id.* at 27:20–25 ("[H]er understanding of the business didn't improve.").) Mr. Green's informal coaching, therefore, failed to produce sustained improvement in Ms. Vigil's performance, and Ms. Vigil does not dispute that, "[f]rom [Mr.] Green's perspective, [her] attitude was consistently poor throughout the whole time she was part of the SAP account team." (Docket No. 36 ¶ 42.)

By November of 2012, Mr. Green's supervisor, Mr. Butler, found it necessary to become personally involved in addressing complaints about Ms. Vigil made by both sales representatives at ServiceSource and clients at SAP. Mr. Green had already informed Mr. Butler of the complaints he had received from sales representatives regarding Ms. Vigil – including that her performance was negatively affecting morale on the SAP account – as early as July of 2012. In November of 2012, however, two sales representatives under Ms. Vigil's supervision contacted Mr. Butler directly to complain about Ms. Vigil and her leadership. Mr. Butler was further aware that a client at SAP had expressed concern over Ms. Vigil's knowledge of SAP's business and her ability to properly manage the account. (Docket No. 30-3 (Depo. B. Butler), 89:16–23,

---

[4] Ms. Vigil disputes ServiceSource's assertion that her understanding of SAP's business did not improve by "submit[ting] she had a reasonable understanding of the business in the first place and there was no need for improvement." (Docket No. 36 ¶ 44.) Ms. Vigil's argument does not, however, effectively rebut Mr. Green's testimony that her business intelligence did not improve with time, nor does she provide any citation to the record – including to her own deposition testimony – to support her argument.

4

119:3–8.)[5]

Accompanied by Mr. Green, Mr. Butler approached ServiceSource's Human Resources Director, Michelle Gillmore, for advice in preparing for a November 26, 2012 coaching session with Ms. Vigil to address these complaints. Ms. Vigil does not dispute that, during this meeting, Mr. Butler instructed Ms. Vigil that "she needed to work on her knowledge related to the account and that a customer had expressed concern about [her] knowledge of the account." (Docket No. 36 ¶ 56.) Ms. Vigil responded positively to Mr. Butler's suggestions regarding her management of the sales representatives and her knowledge of SAP's business, acknowledging that she could improve. For a few weeks after Ms. Vigil's meeting with Mr. Butler, the "problems" improved between Ms. Vigil and the sales representatives who had complained but, by mid-December of 2012, Mr. Butler was advised that the representatives' issues with Ms. Vigil were ongoing. (*Id.* ¶ 58.) By this point, Mr. Butler had determined that efforts to coach Ms. Vigil were proving fruitless and that he would likely need to institute a formal Performance Improvement Plan ("PIP").[6] (*Id.* ¶ 62 (citing Docket No. 30-3, 108:12–25).)

Ms. Vigil's performance as Team Lead stands in stark contrast to the performance of Mr. Miller, the other Team Lead on the SAP account. Ms. Vigil does not dispute that no one at ServiceSource received any complaints by sales representatives on Mr. Miller's team or from the client, SAP, regarding Mr. Miller's performance. On the contrary, ServiceSource received positive feedback from SAP regarding Mr. Miller's work. Moreover, there is no evidence in the

---

[5] *See supra* footnote 3.

[6] Ms. Vigil asserts, and ServiceSource does not deny, that a PIP is the "*only* written, institutional evaluation used by ServiceSource to document performance of its employees." (Docket No. 35, p. 2.) It is undisputed that Ms. Vigil was never the subject of a PIP during her employment with ServiceSource.

record suggesting that Mr. Miller was the subject of any remedial coaching or disciplinary action during the time that Ms. Vigil was also working on the SAP account.

## II. ServiceSource's Reorganization

In early 2013, ServiceSource implemented a reorganization – as recommended by outside consultants – to simplify the structure of its sales organization. The reorganization "eliminated the account manager and team lead structure, and replaced it with first-line level managers, categorized as Sales Manager 1 and Sales Manager 2, based on experience and proficiency." (Docket No. 36 ¶ 69.) These new job titles and responsibilities were developed by Grant Clarke[7] and Michael Poe (Vice President of the Nashville office), assisted by representative from Human Resources. One of the goals of the reorganization was to retain as many experienced managers as possible and, to that end, ServiceSource focused its reduction efforts on its Team Leads, the least experienced managers in the sales organization.

In conjunction with the directors in the Nashville office, Mr. Clarke, Mr. Poe, and Ms. Gillmore developed criteria and a rating system for the evaluation of employees during the reorganization. In January of 2013, the Nashville office's vice-presidents, directors (including Mr. Butler), and Ms. Gillmore met to evaluate all Team Leads and Account Managers based on these criteria and the rating system. At the meeting, each director evaluated and conducted talent assessments for each of the Team Leads he or she supervised, with the four criteria for evaluation including "Leadership/Engagement," "HPS/Sales Coaching," "Potential," and "Critical to Customer Relation." (Docket No. 30-3 (Depo. B. Butler (Ex. 5)), p. 56.) During the meeting, each director verbally suggested a rating on a scale of 1 to 3 for the employee being

---

[7] In its review of the record, the court was unable to determine Mr. Clarke's role at ServiceSource, assuming that he was an employee of the company and not one of the outside consultants who recommended the reorganization.

evaluated, with 1 being the lowest rating. The meeting was then opened up for discussion about the employee until the director had agreed upon a numerical rating in each category for evaluation. As the director who most closely supervised Ms. Vigil, Mr. Butler suggested ratings for her performance based on his personal observations and interactions with her; his weekly meetings with others who worked with her, including Mr. Green; his weekly calls with SAP; and comments and reports made by other ServiceSource employees. Ultimately, Ms. Vigil was the only Team Lead to receive the lowest possible rating in all four categories, and no one present at the meeting challenged these results. Ms. Vigil has argued that she received this low rating because of her sex and pregnancy (*see* Docket No. 35, p. 8), but it is undisputed that Mr. Butler rated many other female Team Leads highly during this meeting. Moreover, ServiceSource has placed the spreadsheet template used during the evaluation into the record, and the document reveals that many male Team Leads received low ratings. (Docket No. 30-3, p. 56.)

The reorganization action to be taken with respect to each Team Lead was not discussed during the evaluation meeting. Rather, after the evaluations were completed, Mr. Clarke and Mr. Poe reviewed the ratings assigned to each Team Lead and Account Manager and made decisions regarding the action to be taken for each employee, with some employees being retained as Sales Managers and some being encouraged to interview for positions in other groups at ServiceSource. (*Id.*) Based on her low rating and other business considerations, Mr. Clarke and Mr. Poe decided to eliminate Ms. Vigil's position without retaining her as a Sales Manager. Mr. Poe and Ms. Gillmore met with Ms. Vigil to notify her of the change in her employment status and inform her that she could interview for other positions within the company, though Mr. Poe has admitted that the pay in those positions would likely be lower than what Ms. Vigil had been receiving as a Team Lead. (Docket No. 35, p. 7.) Ms. Vigil was further provided with

information about a severance package that offered her four weeks of her base pay.

After Ms. Vigil was advised of the restructuring and elimination of her position, she was informed that she had until the next Friday – the same deadline given to all others affected by the reorganization – to decide whether she would interview for other positions or accept the severance package. Ms. Vigil was aware that there were open positions at ServiceSource for which she could apply and that, if she did not apply for one of those positions by March 1, 2013, her employment with ServiceSource would end. Nevertheless, Ms. Vigil never asked about any available positions or sought an interview for them, nor did she advise ServiceSource whether she intended to accept the offered severance agreement. On March 1, 2013, Ms. Vigil was provided with a separation notice describing the "circumstances" leading to her separation as an "organizational restructure." (Docket No. 30-2 (Depo. M. Gilmore (Ex. 1)), p. 33.)

Ms. Vigil, on the other hand, asserts that she received a low rating and her position as Team Lead was eliminated because she was a woman and had informed management at ServiceSource that she was pregnant in late 2012. (Docket No. 35, p. 3.) Around the time of the reorganization, Ms. Vigil contends that she had been investigating the extent to which she was entitled to maternity leave under the Family Medical Leave Act ("FMLA") and had contacted ServiceSource's Benefits Program Manager, Brooke Larson, to discuss her intent to take such leave. (*Id.*) Ms. Vigil does not dispute, however, that her application for leave was never approved because she never completed the medical certification necessary for final approval.

## PROCEDURAL HISTORY

On November 4, 2014, Ms. Vigil filed this action against ServiceSource, alleging that the company discharged and retaliated against her because of her sex and pregnancy in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.*, as amended by the

Pregnancy Discrimination Act ("PDA"); (2) the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*; and (3) the FMLA, 29 U.S.C. § 2601 *et seq.* (Docket No. 1.)

On May 27, 2016, ServiceSource filed a Motion for Summary Judgment (Docket No. 28), accompanied by a Memorandum (Docket No. 29), a Statement of Undisputed Material Facts (Docket No. 30), and heavily excerpted transcripts of the depositions of Ms. Vigil and various ServiceSource employees (Docket Nos. 30-1–30-7). ServiceSource argues that Ms. Vigil cannot establish a *prima facie* case of unlawful discrimination because she cannot demonstrate that (1) she was qualified for the Team Lead position, in light of her documented inability to manage and develop sales representatives and her failure to understand SAP's business; (2) Mr. Miller, whose position was not eliminated, was similarly situated to her; or (3) she was denied FMLA leave for an improper reason, rather than because she failed to submit the required medical certifications to obtain final approval. (Docket No. 29, pp. 12–20.) Moreover, ServiceSource argues, it had a legitimate, non-discriminatory reason for eliminating her role as Team Lead – the reorganization and the low rating she received due to recurring complaints about her leadership and business intelligence – and there is no evidence that these reasons are mere pretext for unlawful discrimination on the basis of sex or pregnancy. (*Id.*)

On June 30, 2016, Ms. Vigil filed a Response in Opposition to the motion (Docket No. 34), accompanied by a Memorandum (Docket No. 35) and a Response to ServiceSource's Statement of Undisputed Material Facts (Docket No. 36). In the Memorandum, Ms. Vigil concedes that "she would be unable to prevail on an FMLA claim as a matter of law," because the undisputed facts do not support that claim. (Docket No. 35, p. 13.) Nevertheless, Ms. Vigil asserts that she can establish a *prima facie* case of unlawful discrimination on the basis of sex and pregnancy because (1) she was constructively terminated when she was merely "invited to

9

apply" for positions at ServiceSource that were inferior in pay and prestige; (2) she was qualified for the Team Lead position if her performance is judged by the "bottom line," because the SAP account performed well during her tenure; (3) the only difference between her and Mr. Miller was the fact that she was female and pregnant while he was male and not pregnant, and he was treated more favorably than she was during the reorganization. (*Id.* at pp. 6–7, 10–12.) Finally, Ms. Vigil asserts that ServiceSource's proffered reason for the elimination of her position was mere pretext for discriminating against her, because the reorganization was a "mishmash of corporate-speak with no clear evaluation standard," and Mr. Butler's justifications for ranking her so poorly are "impeachable." (*Id.* at pp. 8–10.)

On July 15, 2016, ServiceSource filed a Reply in support of its motion (Docket No. 37), accompanied by additional excerpts from depositions (Docket Nos. 37-1–37-3). ServiceSource challenges Ms. Vigil's insinuation that the reorganization was corporate "slight-of-hand," arguing that the undisputed facts show that its restructuring was genuine and implemented throughout the company, not just in the Nashville office. (Docket No. 37, pp. 2–7.) Moreover, ServiceSource asserts that it was not, as an employer, required to rank employees only by their effect on the company's "bottom line," ignoring their leadership skills and ability to work effectively with others. (*Id.* at pp. 10–11.) According to ServiceSource, it is not the court's role to second-guess the criteria it used to rank employees during the reorganization, as there is no proof that the criteria used were unlawful in any way. (*Id.* at pp. 11–12 (quoting *E.E.O.C. v. Lucent Techs., Inc.*, No. 3:04-082, 2006 WL 156759, at *6 (M.D. Tenn. Jan. 20, 2006)).

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the

10

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

As a preliminary matter, Ms. Vigil concedes in her Response that "summary judgment is appropriate as to her previously filed FMLA [c]laim" (Docket No. 35, p. 13), and the court will, therefore, grant summary judgment on that claim to ServiceSource. Ms. Vigil's remaining claims, therefore, are her claims of unlawful discrimination on the basis of sex and pregnancy brought pursuant to Title VII and the THRA. Both statutory schemes prohibit employers from discriminating against an employee on the basis of her sex or a pregnancy.

In analyzing claims of unlawful discrimination on the basis of sex or pregnancy brought

11

pursuant to Title VII and the THRA, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[8] *See, e.g.*, *Suits v. The Heil Co.*, 192 F. App'x 399, 400 (6th Cir. 2006); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000). Under this framework, the plaintiff must produce evidence of a *prima facie* case of discrimination, including that she was (1) a member of a protected class, (2) qualified for her job, (3) subject to an adverse employment action, and (4) replaced by a person outside her protected class or treated differently than similarly situated non-protected employees. *See, e.g.*, *Asmo v. Keane, Inc.*, 471 F.3d 588, 592 (6th Cir. 2006). If the plaintiff makes the required *prima facie* showing, "the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the employment decision at issue." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 238 (6th Cir. 2005). If the defendant is successful, the burden then "shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). To make this showing, the plaintiff retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that [the defendant] intentionally discriminated against [her]." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001).

      ServiceSource argues that Ms. Vigil cannot establish a *prima facie* case of discrimination on the basis of sex or pregnancy because the undisputed facts demonstrate that she was not qualified to be a Team Lead and no similarly-situated male employee was treated more favorably than she was during the reorganization. (Docket No. 29, pp. 14–18.) Ms. Vigil, on the other hand, argues that the evidence demonstrates that she was well-qualified for the Team Lead

---

[8] Although the *McDonnell Douglas* framework applies only to claims supported by indirect or circumstantial evidence, Ms. Vigil has conceded that she has no direct evidence of unlawful discrimination against her.

position and was similarly situated in all relevant respects to Mr. Miller, a man whose position was not eliminated during the reorganization. (Docket No. 35, pp. 6–7, 10–12.) Ultimately, however, the court need not determine whether Ms. Vigil has established a *prima facie* case of discrimination on the basis of sex or pregnancy. Even if the court assumes that she has, Ms. Vigil has failed to carry her burden of demonstrating that ServiceSource's proffered reason for the elimination of her position – the company's reorganization coupled with her low rating during the evaluation process – was pretext for discrimination against her.

ServiceSource has demonstrated a legitimate, non-discriminatory reason for its elimination of Ms. Vigil's position as Team Lead and decision not to retain her as a Sales Manager after the restructuring. The undisputed evidence establishes that, acting on the advice of outside consultants, ServiceSource instituted a company-wide reorganization that eliminated the account manager and team lead structure. Like all other Team Leads, Ms. Vigil's performance was evaluated during a meeting attended by the Nashville office's vice-presidents and directors, including a director – Mr. Butler – who had been involved in addressing repeated complaints made about Ms. Vigil by the sales representatives under her supervision and clients at SAP. Ms. Vigil received the lowest rating of any Team Lead evaluated and, based on this rating and other business considerations, ServiceSource chose to eliminate her position and give her the opportunity to apply for other positions within the company. ServiceSource has, therefore, presented sufficient evidence demonstrating a non-discriminatory reason for the elimination of Ms. Vigil's position, and the burden shifts to Ms. Vigil to produce sufficient evidence from which a reasonable factfinder could reject this explanation and infer that ServiceSource intentionally discriminated against her because of her sex and pregnancy.

Ms. Vigil has not, however, produced any evidence demonstrating that discrimination

was the true motive behind the ServiceSource's decision not to retain her as a Sales Manager after the reorganization. A plaintiff can demonstrate pretext by showing that her employer's proffered non-discriminatory reason for an adverse employment decision "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). Ms. Vigil has not produced any evidence demonstrating that the reorganization did not happen or that her low rating had no basis in fact, as she has not disputed that sales representatives and clients complained to Mr. Green and Mr. Butler about her management and understanding of SAP's business.

Nor has Ms. Vigil produced evidence demonstrating that the reorganization and her low rating were not the actual motive behind, or were insufficient to warrant, the elimination of her position. For example, Ms. Vigil has submitted no evidence of statements made by others at ServiceSource that could be interpreted as demonstrating discriminatory animus toward women or pregnancy, nor has she demonstrated that anyone's conduct toward her changed after she informed the company of her pregnancy and her intent to take maternity leave. *See Asmo*, 471 F.3d at 594 (concluding that evidence that the plaintiff's supervisor treated her differently than other employees treated her after she announced her pregnancy could be indicative of pretext). Ms. Vigil has also not identified any other Team Lead who had a history of performance issues similar to hers, but who was retained as a Sales Manager after the reorganization because they were not a woman or were not pregnant. On the contrary, the only Team Lead who Ms. Vigil claims was treated more favorably than she is Mr. Miller, but she does not dispute that no sales representative or client complained about Mr. Miller's performance, nor

does she argue that Mr. Miller required the same one-on-one remedial coaching that she received from Mr. Green. Ms. Vigil has, therefore, failed to introduce any evidence that would justify a reasonable factfinder in rejecting ServiceSource's stated reason for the elimination of her position.

Ms. Vigil instead attempts to support her claim with pure speculation as to the true cause behind ServiceSource's decision. Ms. Vigil argues that a reasonable jury could find that the justifications that ServiceSource gives for her low rating are pretext for discrimination because they are "amorphous and subjective" and, therefore "impeachable." (Docket No. 35, pp. 9–10.) Ms. Vigil argues that, because the ratings were based on subjective factors such as "leadership," and because all of the issues with her performance related to "petty grievances and personality conflicts" and not "the bottom line," a reasonable jury could reject the "squishy, ill-defined reasoning for why [ServiceSource] valued Mr. Miller over [Ms. Vigil]." (*Id.* at pp. 10–11.) Absent proof that ServiceSource's method for rating its employees was illegal, however, the company was not required evaluate Ms. Vigil based solely on the performance of the SAP account, thereby ignoring repeated complaints about her leadership and competency made by subordinate employees and clients. *See Lucent Techs., Inc.*, 2006 WL 156759, at *6; *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) ("[I]t is inappropriate for the judiciary to substitute its judgment for that of management.").

Moreover, Ms. Vigil's argument incorrectly places a burden on ServiceSource that rightfully belongs with Ms. Vigil. Pursuant to *McDonnell Douglas*, ServiceSource is not required to introduce evidence foreclosing the possibility of any discriminatory motive behind its decision. Rather, once ServiceSource produced *some* admissible evidence demonstrating a legitimate reason for the elimination of Ms. Vigil's position, the burden shifted to Ms. Vigil to

submit evidence amounting to more than mere speculation that the real motivation behind that decision was discriminatory. *See Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 620 (6th Cir. 2003) (concluding that a plaintiff's unsupported speculation that he did not receive a promotion because of his race, which was "grounded not in evidence, but in the outcome [of the promotion decision] itself," was "not sufficient to raise a genuine issue of material fact with respect to the legitimate, non-discriminatory reason" proffered by the defendant).

As discussed above, Ms. Vigil has failed to introduce evidence sufficient to demonstrate that a genuine dispute of fact exists that supports a finding of pretext, and summary judgment is thereby appropriately granted on her claims brought pursuant to Title VII and the THRA.

## **CONCLUSION**

For the reasons discussed herein, ServiceSource's Motion for Summary Judgment will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge